Missouri Pacific Railroad Company, et al., *v.*
Hunnicutt.

4-4620

Opinion delivered May 3, 1937.

*R. E. Wiley, R. M. Ryan* and *Henry Donham,* for appellant.

*John L. McClellan* and *Tom W. Campbell,* for appellee.

Butler, J. This case was originally instituted to recover damages for personal injuries sustained by appellee while he was in the employ of the appellants. Ap-

pellee alleged that at the time of the accident he was engaged in interstate commerce in that he was at work upon a track used in connection with a coal chute which furnished coal for the operation of interstate trains upon appellants' line of railroad; that appellants were engaged in interstate commerce in that they were operating interstate trains over said railroad track which were supplied with coal from said chute, the coal being necessary for the operation of said trains.

A petition for removal of the cause to the federal court with proper bond was filed. The right to removal alleged was that the appellants were residents of the state of Missouri and appellee of the state of Arkansas; that, therefore, there was a diversity of citizenship existing between the parties and that the amount in controversy exceeded the sum of $3,000. It was further alleged in said petition that the allegations in appellee's complaint relating to his employment in interstate commerce were untrue and fraudulently made to state a case within the Federal Employers' Liability Act and to defeat the federal court of jurisdiction, and under the allegations, on motion made in the federal court, the case was remanded to the state court. The necessary effect of this order was to find (1) that the allegations of the complaint were not fraudulently made, and (2) that the facts alleged constituted a cause of action within the purview of the Federal Employers' Liability Act.

There was a trial of the cause on remand in which the appellants contended that appellee, at the time of his injury, was not engaged in interstate commerce within the meaning of the act aforesaid; also, that the undisputed testimony failed to establish any negligence upon the part of the appellants which occasioned the injury for which suits for damages was brought. On these grounds the appellants requested an instructed verdict which was overruled.

On appeal to this court, it was contended that the trial court erred in refusing to direct a verdict in favor of the appellants. The argument was made that appellants were entitled to a verdict because of failure of the

proof to establish appellee's employment in interstate commerce and, as a further and additional ground, that there was no negligence shown. This court reversed and remanded the judgment on other grounds than those raised in the request for a directed verdict, but the alleged error of the trial court in refusing to direct a verdict was overruled, and, in disposing of that matter, it was stated: "The majority are of the opinion that the evidence was sufficient to go to the jury on the question of negligence since appellee was acting under the immediate directions of the foreman in the manner of doing the work and that the injury received, or some injury, might reasonably have been foreseen by the exercise of ordinary care as to the manner of doing the work by the foreman. * * * The question is also argued as to whether appellee was engaged in interstate commerce within the meaning of the Federal Employers' Liability Act. We think the evidence sufficient to take that question to the jury. Other questions are argued which may not arise on another trial, and we do not discuss them." *Missouri Pacific Rd. Co.* v. *Hunnicutt,* 192 Ark. 441, 93 S. W. (2d) 131.

The appellants admit the principle that issues decided on former appeal become the law of the case and, whether right or wrong, will not be disturbed on subsequent appeal, but cite an exception to this rule, i. e., that, where the testimony on the second appeal is substantially different, the former findings of fact will not be binding. *St. L. I. M. & S. Ry. Co.* v. *York,* 92 Ark. 554, 123 S. W. 376, and contend the facts in this case bring it within the exception. On the first trial the facts developed by the evidence are stated in *M. P. Rd. Co.* v. *Hunnicutt, supra,* and on the question of negligence are identical with those in the record now before us, except for the testimony given by Mr. Morse, one of the workmen engaged in the operation which resulted in appellee's injury. On the first trial the evidence was to the effect that appellee was injured while in the act of striking a railroad tie to loosen it by some object which flew up and hit him in the eye, destroying it. Just what this

object was the testimony did not disclose, but this has been supplied by the testimony of Morse who was called by the appellants. He testified that this object was a rail spike, the point of which was struck by appellee as he was hammering upon the tie; that witness and appellee were called to loosen the ties in order to extract the lug screws; that appellee was handed a maul by the foreman and given directions to strike the ties to effectuate this purpose; that, in obedience to this order, appellee began working forward striking the ties ahead of him. Witness did not know how many blows appellee had struck, but at the time the work was begun, he observed no foreign object on or about the ties. After appellee had struck two or three times just before the accident and as he was in the act of again striking the tie, witness for the first time observed a rail spike lying against the rail. Witness' statement as to this matter is as follows: "It was up against the rail and when he hit the first time the spike rolled out and when he hit the other lick, the last lick on the tie, he hit it twice and it rolled out and then he hit it a third lick, the tie the spike was on, and he caught the end of it." Witness further stated in answer to questions that when appellee began striking no apparent danger was observable and that after the spike rolled out and witness saw it, he had no time to warn appellee who probably did not see it. The witness further stated that appellee had not been engaged in pulling any of the rail spikes; that this was done by others and it was the duty of the foreman to see that the spikes were removed from the track. (A rail spike is about four inches long and used to fasten the rails upon which the cars run to the ties and is not to be confused with lug screws which the appellee, at the time of his injury, was engaged in extracting.)

The effect of the additional evidence in no particular disputes the evidence formerly introduced, but tends to make certain the nature of the object which struck appellee in the eye and which, on the state of the evidence at the former trial, was conjectural. Therefore, the conlusion reached by this court on the first appeal remains

the law of the case as to the sufficiency of the evidence to warrant the verdict of the jury on the question of negligence. The only new issue to be injected by the additional testimony is that of assumed risk. Appellants contend for the rule that where the conditions of the work are constantly changing so as to increase or diminish its safety, it is the servant's duty to make the working place safe and no duty in that regard rests upon the master. It is contended that this is the principle announced in *Grayson-McLeod Lbr. Co.* v. *Carter*, 76 Ark. 69, 88 S. W. 597, and other cases cited in appellant's brief. If the rule be as contended, it has no application in the instant case as the injury was not occasioned by a change in the structure caused by the operations of the appellee, but was the result of a foreign substance left upon the track by other employees which from the evidence, the foreman should have seen was removed.

At the request of the appellants the trial court correctly instructed the jury on the doctrine of assumed risk, both as to the ordinary and usual risks of employment and the extraordinary risks which were open and obvious to the servant. It is contended that under the testimony in this case the danger from the rail spike was open and obvious to that degree that the trial court should have so declared as a matter of law. Appellant has evidently overlooked that part of the testimony of Morse to the effect that the rail spike was in a manner concealed so as not to be observable when appellee first began the work he was directed to perform by the foreman and that when witness first saw the spike roll into view he had no opportunity to warn appellee of its presence and appellee had no time to check his blow and probably did not see the spike. This evidence clearly made it a question for the jury as to whether or not the danger was so open and obvious as to be plainly discoverable by appellee. If it was not of this character, he could not be deemed as a matter of law to have assumed the risk of a danger which he might not have known. This is especially true as appellee, at the time, was acting under the direct orders and supervision of his foreman. The cases

cited by appellant sustain this conclusion. Among these are: *Murch Bros.* v. *Hays,* 88 Ark. 292, 114 S. W. 697; *Southern Anthracite Coal Co.* v. *Bowen,* 93 Ark. 140, 124 S. W. 1048; *Sheldon Handle Co.* v. *Williams,* 122 Ark. 552, 184 S. W. 43; *Moline Timber Co.* v. *McClure,* 166 Ark. 364, 266 S. W. 301.

On the question as to whether or not appellee was engaged in interstate commerce at the time of the accident within the meaning of the Federal Employers' Liability Act, *supra,* the evidence on both the first and second trials tended to establish the allegations of the complaint. The coal chute was a structure elevated above the main railway tracks consisting of a track connecting with the main line and ascending an incline for perhaps 200 feet and then leveling out for the remainder of the distance of the track. Along the level part of the track were stationed receptacles into which coal might be dumped from cars brought up from below. These receptacles, or "pockets," were so constructed that by the operation of a mechanical device coal could be dumped from them into the tenders of locomotives. The coal chute had not been used for some twelve or eighteen months prior to the time of the beginning of its repair in question, but its use became again necessary and appellee and his fellow-workman had been engaged in its repair for several days before the date of the injury to appellee. These repairs had not been fully completed, but had progressed to a degree sufficient to enable coal cars to use it and at least one locomotive had been serviced from the chute before the injury. The trains obtaining coal from this chute were engaged in both interstate and intrastate transportation.

In the case of *Erie Railroad Co.* v. *Collins,* 253 U. S. 77, 40 S. Ct. 450, 64 L. Ed. 790, the employee, at the time of his injury, was operating a gasoline engine to pump water into a tank for the use of locomotives engaged in both interstate and intrastate commerce. In the case of *Erie Rd. Co.* v. *Szary,* 253 U. S. 86, 40 S. Ct. 454, 64 L. Ed. 794, the employee, when injured, was engaged in drying sand by the application of heat to be used by locomotives

operating in both kinds of commerce. In each of those cases it was held that the employee was engaged in interstate commerce at the time of injury within the terms of the Federal Employers' Liability Act. Those cases were overruled by the case of *Chicago & E. I. Ry. Co.* v. *Industrial Commission of Illinois,* 284 U. S. 296, 52 S. Ct. 151, 76 L. Ed. 304, 77 A. L. R. 1367, and it is upon this case that appellants chiefly rely to support their contention that the employee in the instant case was not engaged in interstate commerce. In that case the employee was injured while oiling an electric motor used for hoisting coal into a chute to be thence taken and used by locomotives employed principally in moving interstate freight. The court held that the employee was not engaged in interstate transportation or in work so closely related thereto as to be practically a part of it, and was not engaged in interstate commerce within the meaning of the Federal Employers' Liability Act. This decision was grounded upon the cases of *Shanks* v. *Delaware etc. Ry. Co.,* 239 U. S. 556, 36 S. Ct. 188, 60 L. Ed., 436 L. R. A. 1916C, 797; *Chicago, etc., Ry. Co.* v. *Harrington,* 241 U. S. 177, 36 S. Ct. 517, 60 L. Ed. 941, and *Chicago, etc., Ry. Co.* v. *Bolle,* 284 U. S. 74, 52 S. Ct. 59, 76 L. Ed. 173.

In the Shanks case the railroad company was engaged in both interstate and intrastate transportation and was conducting an extensive machine shop for repairing parts of locomotives used in such transportation. Shanks was employed in the shop and on the day of his injury was engaged solely in taking down an overhead countershaft and putting it into a new location. By this shaft, power was communicated to some of the machinery used in the repair work. His work, however, usually consisted of repairing certain parts of locomotives. The court held that the nature of his employment was to be determined as of the time the injury occurred and that at such time he was not engaged in interstate commerce within the meaning of the Federal Employers' Liability Act.

In the Harrington case, it was held that an employee did not come within the meaning of the act, *supra,* when

engaged in removing coal from storage tracks to coal chutes. In thus holding, the court called attention to the Shanks case, *supra*, and *Delaware, etc., Ry. Co.* v. *Yurkonis,* 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397, where it was held that an employee of the carrier, while engaged in mining coal in the carrier's colliery intended to be used by its interstate locomotive, is not engaged in interstate commerce within the meaning of the act.

In the Bolle case, the employee at the time of injury was engaged in firing a stationary engine to generate steam to be used for heating a depot and other rooms devoted to general railroad purposes. This steam was used also for heating suburban coaches while standing in the yards. Some of these coaches, taken off of interstate trains, were heated, when necessary, before being taken up by other interstate trains. At times steam was used to prevent freezing of a turntable used for turning engines employed in both kinds of traffic. The court said: "The sole object of the movement of the substitute engine was to procure a supply of coal for the purpose of generating steam. Its movement was in no way related to the contemplated employment of the other three locomotives in interstate transportation; and its use differed in no way from the use of the stationary engine when that was available."

It seems that a distinction may be drawn between the cases above cited and the instant case. Here, the appellee was engaged in the repair of that part of a railroad track which is just as much a part of the railroad and as necessary for its proper operation as were passing tracks or bridges across streams on which the tracks were laid. In the case of *Kansas C. S. Ry. Co.* v. *Leinen,* 144 Ark. 454, 223 S. W. 1, this court noted the conflict in the cases upon the question of when an employee on an interstate commerce road is, or is not, working under the provisions of the Federal Employers' Liability Act. In this connection the court observed: "The greatest number and latest decisions from that source (U. S. Court) have, we think, made a distinction between rolling stock, tools, and other appliances of a railroad

which may or may not be used in its interstate service and its tracks, and settled the proposition that track maintenance or repairs not only facilitate, but are imperatively necessary to, all interstate commerce passing over the line; and the work of one engaged in such repairs is so directly connected and immediately beneficial to all commerce which uses the road that he must be regarded as covered by the act."

In *Pederson* v. *Del., etc., Ry. Co.*, 229 U. S. 146, 33 S. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914C, 153, the employee of the railroad company was an iron worker engaged in the repair of some of the railroad's bridges and on the afternoon of his injury acting under the direction of his foreman, was carrying some bolts or rivets from a tool car to a bridge which were to be afterwards used by him in making some repair upon the bridge which was used in both interstate and intrastate commerce. It was held that this state of facts established employment in interstate commerce within the meaning of the federal act.

In *Philadelphia, etc., Ry. Co.* v. *Smith*, 250 U. S. 101, 39 S. Ct. 396, 63 L. Ed. 869, it was held that employment in interstate commerce exists within the meaning of the act where an employee whose duties were to cook and make the beds for a gang of bridge carpenters in a camp car provided for that purpose and moved from place to place and who, at the time of injury, was within the car on a side-track and occupied in cooking a meal for the bridge gang.

But whatever may be the state of the law, the question is concluded in the instant case by our holding on the former appeal. On the first trial the evidence was to the effect that the coal chute was used for the purpose of supplying coal to locomotives engaged in both interstate and intrastate commerce and while the chute was not fully repaired, it was to the extent that it was being used at the time of appellee's injury; and, on a day or two previous, coal had been supplied from it to fuel a train engaged in interstate commerce. On the second trial the evidence went more into detail as to the nature

of the work in which appellee was engaged and the purpose for which the chute was being used and the purpose of its future use. In all essential particulars, however, the evidence was substantially the same on both trials and our conclusion on the first appeal becomes the law of this. Therefore, we must now hold that the evidence was sufficient to establish employment within the meaning of the federal act, *supra*.

Before presenting to the jury the written instructions, the trial court gave oral instructions, with no objection being interposed at that time, on the burden of proof and the definition of interstate commerce. After the oral instructions were given, the instructions given at the request of the appellee were read to the jury and those given at the request of appellants. After this, counsel for appellants objected to the action of the court in the giving of oral instructions and requested that same be reduced to writing. The court overruled the objections on the ground that they had not been interposed in apt time, but directed the reporter to transcribe the oral instructions and to file them with the written instructions. Thereupon the appellants' counsel objected specifically to the definition of interstate commerce contained in the oral instruction.

We can understand the reluctance of the trial court to delay the trial for the purpose of reducing to writing oral instructions already given when the request is made after the written instructions are given. Notwithstanding this, it is the better practice that the request be complied with although resulting in delay, but apt objection should be made and we think that the direction to the reporter to write out the oral instructions was sufficient to remove any prejudice especially as the oral instructions were substantially covered by the written ones. The definition of interstate commerce given by the court in its oral instruction was perhaps not entirely accurate, but all doubt on this question was removed by a written instruction given at the request of appellants both as to the burden of proof and the definition of employment in interstate commerce, as follows:

"You are instructed that the burden is upon the plaintiff to prove by a greater weight of the evidence that at the time he received his injury he was employed in interstate commerce, which means that he was engaged in doing some work in furtherance of interstate transportation or so closely connected therewith as to become a part of interstate transportation. And unless the plaintiff has proved this by a preponderance of the testimony, then your verdict will be for the defendant." *National Lbr. Co.* v. *Snell*, 47 Ark. 407, 1 S. W. 708; *Hlass* v. *Fulford*, 77 Ark. 603, 92 S. W. 862; *O'Neal* v. *Richardson*, 78 Ark. 132, 92 S. W. 1117; *Arkansas Lbr. & Contractors' Supply Co.* v. *Benson*, 92 Ark. 392, 123 S. W. 367; *Josephs, Executor* v. *Briant,* 115 Ark. 538, 172 S. W. 1002; *Merrill* v. *City of Van Buren,* 125 Ark. 248, 188 S. W. 537; *Reed* v. *Rogers,* 134 Ark. 528, 204 S. W. 973.

It is contended that the trial court erred in directing appellee's counsel to read to the jury an instruction given at appellee's request and directing appellants' counsel to read the instructions given at their request. This contention is grounded upon § 23, of art. 7, of the Constitution, providing that judges shall declare the law to the jury, and § 1292 of C. & M. Digest providing that when the evidence is concluded either party may request instructions to the jury on points of law which shall be given or refused by the court. In this particular, we think the better practice is for the trial court to read the instructions to the jury without any mention being made as to the instructions being requested by either of the litigants. But, in this as in the matter of the oral instructions given, we think no prejudice resulted. The court stated to the jury that the written instructions read and the oral instructions given were the instructions of the court and that the jury was bound to consider the same as the law of the case.

It is lastly insisted that the verdict returned by the jury is excessive. The verdict was for $13,000. The blow from the rail spike completely burst appellee's eyeball, necessitating its removal, and cut and bruised his

face. The operation was performed twenty days after the injury during which time it was necessary for the appellee to take from three to five hypodermics a day to allay his suffering, and after that he continued to suffer and the loss of one eye affected the sight of the other. He stated that the effect of his injury was to prevent him from doing any work of the nature of that for which he had been trained, and there is no evidence to the contrary. At the time of his injury, appellee was fifty-one years of age, a strong and robust man, earning $3.60 a day, with a life expectancy of twenty years. We do not think the amount of the verdict is such as to justify the presumption that it was the result of passion or prejudice and we do not feel that we would be justified in reducing the amount.

The judgment of the trial court will, therefore, be affirmed.